UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MAUVAREEN BEVERLEY, M.D.

                              Plaintiff,

          -against-

1115 HEALTH & BENEFITS FUND, et al.

                              Defendants.
-------------------------------------------------------X
FEUERSTEIN, J.

FILED
IN CLERKS OFFICE
U.S. ~~~~ COURT ED N.Y.

★ DEC 1 2 2005 ★

    P.M. ──────
TIME A.M. ──────

02-cv-1834
(SJF)(VVP)

**OPINION & ORDER**

I.     Introduction

       Plaintiff Mauvareen Beverley ("Plaintiff" or "Beverley") commenced this action against

defendants 1115 Health & Benefits Fund ("1115 Fund"), 1199 National Benefits Fund ("1199

Fund"), Charles Hamilton, Jay Sackman and Elenor Tilson (collectively, "Defendants") pursuant

to 42 U.S.C. § 1981, New York State Executive Law § 295 *et seq.* ("NYHRL") and Article 8 of

the New York City Administrative Code ("NYC Code") alleging racial discrimination.

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set

forth below, Defendants' motion for summary judgment is granted.

II.    Background

       Beverley, an African-American woman, was employed as Medical Director of the 1115

Fund from September 1998 until November 8, 2001. (Cmplt. ¶¶ 4, 11, 30; Def. 56.1 Stmt. ¶14;

Pl. 56.1 Stmt. ¶ 14). The 1115 Fund was a Union-Employer Welfare Benefit Fund that provided

employee health benefits to members of District Council 1115 at medical clinics in Westbury

and Queens, New York. (Cmplt. ¶ 5; Def. 56.1 Stmt. ¶¶ 2, 7; Pl. 56.1 Stmt. ¶¶ 2, 7). Beverley, a

1

physician, was responsible for "supervising the staff in the medical department as well as developing patient care assessments, implementing physician and patient education programs, and creating a network of physicians affiliated with the [1115] Fund." (Pl. 56.1 Stmt. ¶ 16). Plaintiff reported to Charles Hamilton, an attorney, who served as the 1115 Fund's Administrator and Manager. (Cmplt. ¶ 7; Pl. 56.1 Stmt. ¶ 4; Def. 56.1 Stmt. ¶ 4). Hamilton is Caucasian. (Cmplt. ¶ 7).

According to Plaintiff, her relationship with Hamilton was at first "professional and harmonious." (Beverly Decl. ¶ 10). Plaintiff claims to have "received high marks and compliments from the [1115] Fund, in particular from [Jay] Sackman . . . ", a member of the 1115 Fund's Board of Trustees (Id.). In the latter part of 1999, however, Plaintiff claims that Hamilton "made some decisions and engaged in some actions that I felt were motivated by my race and by the race of my Clinic Manager, Debbie Carnarvon, also African American [sic]." (Id. ¶ 11). Specifically, in October 1999, Plaintiff was notified by Jamie Olken, an employee under her supervision, that Plaintiff's attendance was required at a meeting with Olken, Hamilton and Elena Dundon, the 1115 Fund's Human Resources Manager. (Id.). This meeting, Plaintiff learned, "had been called because Olken had complained to Hamilton about my style of management . . . . I was . . . taken aback by the fact that Hamilton and Dundon did not first bring it to my attention that Olken had gone over my head . . . ." (Id. ¶ 13). According to Plaintiff, Olken had resisted supervision and was being "generally uncooperative." (Id. ¶ 12). Plaintiff claims she had responded by "firmly but gently insist[ing] on her meeting my performance and behavioral expectations." (Id.)

As a result of the meeting, at which Olken had voiced her concerns about working with Plaintiff, Hamilton altered the 1115 Fund's reporting structure such that Olken no longer

2

reported to Plaintiff, and instead reported directly to him. (Id. ¶ 16). Plaintiff found this

resolution "untenable." (Id.). According to Plaintiff,

> Olken worked in my department, and her work had a direct impact
> on the . . . [areas] for which I bore the ultimate responsibility . . . .
> [Furthermore], I now had an insubordinate worker within my
> department who had been given blanket immunity to defy my
> authority. Olken had literally thumbed her nose in my face and
> gotten away with it. Hamilton's action seriously undermined my
> authority in the Department and was publicly humiliating.

(Id.).[1] According to Hamilton, he decided to move Olken "[o]n advice of human resources,

[because] we figured out that that was a way for a period of time at least to lessen the potential

direct conflict between the two of them." (Brody Aff., Ex. 5, pp. 71-72.) This restructuring,

Hamilton claims, was designed to "avoid the two of them continuing to have confrontations, so I

put myself in the middle between the two of them." (Id. at 72).

At about the same time, Plaintiff claims that Hamilton also proposed shifting "a large

number of important supervisory responsibilities from my Clinic Manager, Debbie Carnarvon, to

Olken." (Beverly Decl. ¶ 18). According to Plaintiff, however, Carnarvon had been "an

exceptional supervisor and administrator . . . [and] Olken had no supervisory experience and

very little administrative experience." (Id.). It was at this point that Plaintiff claims to have

"beg[u]n thinking that race played a part in how [Hamilton] was dealing with issues in the

Medical Department." (Id. ¶ 19). In particular, Plaintiff claims that Hamilton made two

comments that prompted this suspicion. First, "[i]n discussing his proposal to promote Olken,

Hamilton mentioned that there was a 'perception' that Carnarvon was the Assistant Medical

Director and that our relationship was 'very close.'" (Id.) Second, Plaintiff claims that Hamilton

---

[1]There does not appear to be any serious allegation that Olken "literally" thumbed her nose at Plaintiff.

"accused [her] of surreptitiously upgrading Carnarvon's title without going through the proper

channels." (Id.) According to Plaintiff,

> [t]he clear implication to me was that this was about the fact that both Carnarvon
> and I were African American. Carnarvon had worked at the Fund for ten or
> twelve years and Hamilton himself had told me that she was highly regarded by
> the previous Medical Directors. The difference was that she was now being
> supervised by an African American, and all of a sudden this made our close
> working relationship suspect.

(Id. ¶ 20). By Plaintiff's own admission, however, nobody mentioned her or Carnarvon's race

when Carnarvon's responsibilities were shifted to Olken. (Id. ¶ 21) ("*I* concluded that

Hamilton's judgment might be clouded by racial stereotypes . . . .") (emphasis added).

A.     The December 8, 1999 Memorandum

On December 8, 1999, Elena Dundon wrote a memo to file regarding a conversation she

had with David Hellman about a health and benefit seminar he conducted with management

staff. (O'Neill Decl., Ex. H). In relevant part, the memo states

> It was the first time [Hellman] had met . . . Dr. Beverly. He informed me that Dr.
> Beverly had arrived the first day over two hours late, it had something to do with
> traveling arrangements. He said she was an hour late on the second day.
> Additionally, he described her to me as reminding him of dark vader [sic] from
> star wars, she makes a very articulate presentation of herself, but down inside she
> had no intention of being part of a team or this group. I asked him to explain that
> to me and he told me that throught [sic] the workshop he was getting the districnt
> [sic] impression that she wasn't interested in being part of the H&B team and on
> Tuesday at the end of the workshop when he was talking about their achieving
> their goals through team particpation, she made a statement to recap "So this is
> going to be a team effort", he said it was almost as if she was getting it and wasn't
> approving of it. Additionally, David said he saw a divide and that she, Debbie,
> Carol, Karina and Marty seemed to be on one side and it wasn't clear why that
> was. He said Charlie, Jamie, Marge and Lily participated.

(O'Neil Decl., Ex. H).

4

B.    The January 5, 2000 Memorandum

Soon after Olken took on the additional responsibility, Plaintiff claims that "Hamilton became more aggressive and confrontational in his communications with me. He started finding fault in nearly all of my work, as if he were going out of his way to find things to criticize." (Id. ¶ 23). Furthermore, Hamilton began to rely on e-mail to communicate with Plaintiff, to which Plaintiff, who was "relatively computer illiterate," objected. (Id. ¶ 23). As a result, shortly before Christmas, Plaintiff claims that she and Hamilton "agreed that we would stop sending each other 'poison email' and work to building more positive communications in the coming year." (Id. ¶ 24). Plaintiff then left for vacation.

Upon returning from vacation, Plaintiff claims to have discovered that, in her absence, "Hamilton had launched a major criticism of Carnarvon concerning a directory of physicians that the Medical Department was preparing for member use." (Id. ¶ 25). According to Plaintiff, this criticism was "unfair bordering on the ridiculous." (Id.) Specifically, while Plaintiff concedes some of the substance of Hamilton's comments, (id. ¶ 26) ("By themselves, there was nothing wrong with Hamilton's comments . . . ."), she principally took issue with their timing. (Id.). "[T]he design and structure had been discussed and settled upon much earlier, and the other departments had already had their input." (Id.). Furthermore, Plaintiff claims that when Carnarvon defended herself and the directory, Hamilton rebuked her and told her that the problems with the directory were symptomatic of a larger "us versus them" mentality between the 1115 Fund's departments. (Pl. 56.1 Stmt. ¶ 41).

On January 5, 2000, Plaintiff wrote a memorandum to Hamilton "objecting to his picking on my employee during my absence." (Beverly Decl. ¶ 27). In addition to addressing the substance of Hamilton's criticisms of the directory, Plaintiff also noted that Hamilton had

"become adversarial and critical in his dealings with the Medical Department, while his approach towards Claims and Mental Health was cooperative and collaborative, as if engaged in teamwork. I noted that Claims and Mental Health were headed by Whites, while Carnarvon and I were African American [sic]." (Id. ¶ 27). As she explained in the memorandum, "[t]he other glaring and obvious "WE" is yourself, Marge [Botsch], Jamie [Olken] who are white and Debbie [Carnarvon] and myself who are African American [sic] women." (Brody Aff., Ex. 13, p. 6) (capitalization in original).

According to Hamilton, he understood this memorandum to "accus[e him] of discriminating against [Plaintiff] and Debbie [Carnarvon] because they're African-American women so [he] handed it over to HR . . . to investigate the allegations." (Id., pp. 142-43; Brody Aff., Ex. 10, p. 35). Upon receipt of this memorandum, Elena Dundon contacted 1115 Fund's legal counsel, Rick Greenspan, and Jay Sackman. (Brody Aff., Ex. 10, pp. 35-36). Sackman instructed Dundon to establish a committee of Plaintiff's peers to investigate the allegations. (Id. at 36). The committee was comprised of four individuals: Pamela Spinelli, Director of the 1115 Legal Services and Benefit Fund, Dr. Lee Stokes, Director of the 1115 Scholarship Fund, Ellswith Olgadez, a senior attorney at the 1115 Legal Services and Benefit Fund and Larry Chorowski, a Systems Manager at the 1115 Fund. (Def. 56.1 Stmt ¶ 50; Pl. 56.1 Stmt. ¶ 50 ). Dr. Stokes and Ms. Olgadez are African-American. (Def. 56.1 Stmt ¶ 50; Pl. 56.1 Stmt. ¶ 50). Defendants claim that Plaintiff was given an opportunity to request that particular individuals not be included on the committee. (Def. 56.1 Stmt. ¶ 51). As a result, Defendants claim that Dr. Gerard Menzies, the Dental Director, was not included. (Id.). Plaintiff challenges this on the ground that the supporting documentary evidence is hearsay. (Pl. 56.1 Stmt. ¶ 51).

After reviewing documents and interviewing witnesses, (id. ¶ 57), the committee unanimously concluded that there was no evidence of racial discrimination. (Id.). Plaintiff concedes that she met with the committee twice and was afforded a full opportunity to present information, (Pl. 56.1 Stmt. ¶ 53), but challenges the committee's finding on the ground that all four of the committee members reported, either directly or indirectly, to Hamilton. (Id. ¶ 50, 58). Plaintiff expressed her dissatisfaction with the committee's finding to Stokes, who relayed her feelings to Sackman. (Def. 56.1 Stmt. ¶ 58; Brody Decl., Ex. 20). According to Defendants, Sackman responded by proposing to engage an outside consulting firm, Brown & Brown Associates, Inc. or another firm of Plaintiff's choosing in an attempt to further address Plaintiff's concerns. (Def. 56.1 Stmt. ¶ 60-61). While Plaintiff contends that Brown & Brown was originally engaged to address problems with another employee, (Pl. 56.1 Stmt. ¶ 60), it is undisputed that Brown & Brown met with both Beverley and Hamilton and provided sensitivity training to members of the Medical Department. (Def. 56.1 Stmt. ¶ 63; Pl. 56.1 Stmt. ¶ 63). Plaintiff further acknowledges that Sackman told her he would "entertain suggestions from plaintiff" as to which firm should be engaged. (Pl. 56.1 Stmt. ¶ 61).

According to Plaintiff, however, after her January 5, 2000 memo,

> my worst fears materialized . . . [and] Hamilton subjected me to a campaign of negative attention and disparate treatment in retaliation for accusing him of discriminatory conduct. This campaign continued until the day of my termination. Throughout the rest of my tenure with the Fund, Hamilton refused to engage himself in anything resembling a professional relationship with me. He was petty, childish, vindictive, churlish and at times downright hostile. He isolated me from the rest of the Fund and the Board, he froze me out of normal Fund activities, he opposed my ideas, he interfered with my management and continually second guessed [sic] my decisions and actions. He acted more like my parole officer than my supervisor, ready to pounce on me for any and all infraction [sic] against Fund Policy, real or imagined, large or small. He gave me no support at all, always willing to [take] any opportunity that presented itself to put me, my department, or my work in a negative light.

7

(Beverly Decl. ¶ 35). This behavior, Plaintiff alleges, began "almost immediately" after the January 5, 2000 memo. (Id. ¶ 36). Furthermore, Plaintiff claims that Hamilton refused to meet with her alone, and began communicating with her via e-mail. Plaintiff perceived many of these e-mails as "insulting or demeaning." (Id. ¶¶ 36, 38). She also claims to have been cut off from meetings she had previously attending including, after December 2000, meetings of the Board of Trustees. (Id. ¶ 40). On January 11, 2001, Plaintiff went to Hamilton's office but was told "get the fuck out of my office." (Id. ¶ 41; Ex. B).

Plaintiff further cites the treatment of a February 2000 memorandum she wrote as evidence of discriminatory treatment. According to Plaintiff, she wrote a memorandum to Hamilton asking him to "clarify" certain aspects of the newly created Mental Health Department headed by Olken. (O'Neill Decl., Ex. F.). Upon receipt of the memorandum, Hamilton forwarded the memorandum with comments to Olken without 'copying' Plaintiff. (Id.). Olken, in response, characterized the letter as "pathetic" and writes that it "just shows [Plaintiff] would rather destroy than help our members . . . [and that] she can't handle any change . . . ." (Id.)

C.   The Draft EEOC Charge

Plaintiff, through counsel, sent a draft EEOC charge to Sackman on February 15, 2001. (Def. 56.1 Stmt. ¶ 85; Pl. 56.1 Stmt. ¶ 85). Sackman passed the charge along to Dundon who, according to Defendants, determined that "the issue had already been raised by [Plaintiff] and fully investigated by the [1115] Fund." (Def. 56.1 Stmt. ¶ 88). The charge was never filed with the EEOC, and was not distributed to anyone else at the 1115 Fund. (Def. 56.1 Stmt. ¶¶ 89, 115; Pl. 56.1 Stmt. ¶¶ 89, 115).

D.   1115 Medical Services, P.C.

District Council 1115 merged with another union, 1199 SIEU, in 1999. (Id. ¶ 45; Def. 56.1 Stmt. ¶ 73; Pl. 56.1 Stmt. ¶ 73). As a result of this merger, the 1115 Fund began considering a merger with the 1199 Fund in 2000. (Pl. 56.1 Stmt. ¶ 74; Def. 56.1 Stmt. ¶ 74). According to Plaintiff, it was determined that this merger would result in there being "less money available to the 1115 Fund . . . [and] it [would be] spending money on medical services for employees who were no longer [1115] Fund participants." (Id.). According to Plaintiff, these financial problems, along with the 1115 Fund's desire to continue to treat former 1115 Fund members, led the 1115 Fund to create a professional corporation, 1115 Medial Services, P.C. in January 2001 (the "P.C."). (Id. ¶¶ 46-48). As Plaintiff explains, "[u]nder this arrangement, all of the doctors and medical staff would be employed by the P.C. [which] . . . would bill the 1155 Fund or 1199 benefits fund." (Id. ¶ 47). The reason for this structure, according to Plaintiff, was to "solve the potentially thorny problem of the [1115 Fund] breaching its fiduciary obligations by spending trust money on individuals other than [1115] Fund beneficiaries." (Id.) Plaintiff became the sole shareholder of the P.C. upon its formation, and also became an employee of both the P.C. and the 1115 Fund. (Id. ¶ 48). A similar structure was established for the Dental Fund, and Dr. Menzies became the sole shareholder of the dental P.C. (Pl. 56.1 Stmt. ¶ 76; Def. 56.1 Stmt. ¶ 76).

E. The Merger and Termination

The 1115 Fund merged with the 1199 Fund in January 2002. According to Defendants, Plaintiff opposed the merger, (Def. 56.1 Stmt. ¶ 83), and "did not cooperate with the merger efforts . . . ." (Id. ¶ 85). Plaintiff disputes this assertion, but acknowledges that she "had ideas on how medical benefits could be provided." (Pl. 56.1 Stmt. ¶ 83-84).

Plaintiff was terminated by Hamilton and Tilson shortly before the merger became effective, on November 8, 2001. (Id. ¶ 57). According to Defendants, the decision was made by the Board of Trustees, and Hamilton was not involved. (Def. 56.1 Stmt. ¶ 102-04). Plaintiff disputes this assertion, however, and claims that Defendants have offered conflicting testimony as to who was responsible for personnel decisions at the 1115 Fund. (Pl. 56.1 Stmt. ¶ 92, 102-04). Furthermore, Plaintiff claims that the Board meeting at which her termination was discussed occurred three weeks after she was fired, and was presented "as a *fait accompli*" by Tilson. (Pl. 56.1 Stmt. ¶ 92) (emphasis in original). Regardless, Plaintiff claims she was given no notice and instructed to leave the premises immediately. (Id.).

At her termination meeting, the 1115 Fund offered Plaintiff a severance package consisting of three months salary. (Id.). Plaintiff rejected this offer, however, because it included a release of all claims against Defendants. (Id.). According to Plaintiff, on the same day she was terminated, "Tilson held a meeting with the staff of the Clinic, announced [her] termination and told the staff that the Clinics would continue to operate as in the past. At an earlier meeting, I have heard Tilson tell the [1115] Fund employees that nobody would lose his or her job as a result of the merger." (Beverly Dec. ¶ 58).

According to Defendants, Plaintiff was terminated because her position was to be eliminated in connection with the merger. (Def. 56.1 Stmt. ¶ 92). In support of this, Defendants note that Dr. Menzies, who had the equivalent position in the Dental Department, was also terminated and offered the same severance package. (Menzies Aff. ¶¶ 5-8.; Def. 56.1 Stmt. ¶ 93). While Dr. Menzies is now employed by the P.C. and currently works in the clinic, Defendants claim that the decision to hire him was made by the dental P.C. and not by them. Likewise, Defendants claim, the decision not to hire Plaintiff after the merger was made by the

medical P.C. Plaintiff, in response, argues that the 1115 Fund provided Dr. Menzies and every other physician "the opportunity to continue to operate the [clinics]. The [1115] Fund gave to the physicians . . . two fully equipped medical clinics and nearly $1 million in new financing." (Pl. 56.1 Stmt. ¶ 101; see also Ives Decl. ¶ 17) ("To my knowledge, everyone was offered a job. In fact, the 1199 Fund sent representatives to our offices to interview the staff in order to find jobs for them.")

III.    Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material "if it might affect the outcome of the suit under the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). An issue of fact is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact. Id. The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The trial court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. Id. at 252; Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

The Second Circuit has recognized that direct evidence of discriminatory intent is rare, and often must be inferred from circumstantial evidence found in the pleadings. Holtz, 258 F.3d at 69. Thus, while summary judgment may be appropriate in such cases, it should be done with an extra measure of caution. Id. (citing McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir.

11

1997)); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

IV.     Analysis[2]

        A.      Statutory Scheme

A plaintiff asserting a claim of racial discrimination under 42 U.S.C. § 1981 must allege and eventually prove "(1) [she is a] member[] of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 1999) (citing Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam)); see also General Building Contractors Ass'n. Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982) (holding that § 1981 is only violated by "purposeful discrimination"). The enumerated activities include the right to "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a); see also 42 U.S.C. § 1981(b) ("[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.") The

---

[2] Plaintiff's § 1981, NYHRL and NYC Code claims are analyzed together, as the same analytic framework applies to all three. See Brennan v. Metro. Opera Ass'n, 284 A.D.2d 66, 70 729 N.Y.S.2d 77, 81-82 (1st Dep't 2001); see also Weinstock v. Columbia Univ., 224 F.3d 33, 42 n. 1 (2d Cir. 2000); Citroner v. Progressive Cas. Ins. Co., 208 F. Supp. 2d 328, 339 (E.D.N.Y. 2002). Defendants challenge the applicability of the NYC Code to this action. The NYC Code only "applies only to *acts* occurring within the boundaries of New York City." Salvatore v. KLM Royal Dutch Airlines, 1999 U.S. Dist. LEXIS 15551, at *49 (Sept. 30, 1999 S.D.N.Y.) (emphasis added). Plaintiff claims that the NYC Code should apply because the 1115 Fund has an office in Queens. Plaintiff has not alleged, however, that any of the alleged discriminatory acts occurred in New York City and, indeed, the office in which Plaintiff worked was located in Long Island. (Pl. 56.1 Stmt. ¶ 14; Def. 56.1 Stmt. ¶ 14). Even to the extent the NYC Code does apply, however, Plaintiff has failed to demonstrate improper discrimination, as discussed *infra*, and her claims are therefore dismissed.

Second Circuit has made clear that an at-will employee is protected under § 1981. <u>Lauture v.</u>
<u>International Business Machines Corp.</u>, 216 F.3d 258, 260 (2d Cir. 2000).

In the absence of direct evidence of discrimination, the familiar burden-shifting analysis

first established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973) is applied to §

1981 claims. <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 186 (1989) (superseded by

statute on other grounds) (applying the <u>McDonnell Douglas</u> burden shifting regime to § 1981

claims); <u>see also</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 n. 1 (1993); <u>Gad-Tadros v.</u>

<u>Bessemer Venture Partners</u>, 326 F. Supp. 2d 417, 424 (E.D.N.Y. 2004) (citing <u>Whidbee v.</u>

<u>Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 75 (2d Cir. 2000)); <u>Taitt v. Chemical Bank</u>, 849

F.2d 775, 777 (2d Cir. 1988)); <u>Pronin v. Raffi Custom Photo Lab, Inc.</u>, 383 F. Supp. 2d 628

(S.D.N.Y. 2005) (holding that the <u>McDonnell Douglas</u> test applies when there is no direct

evidence of discrimination).

Plaintiff must first establish a *prima facie* case of discrimination. <u>McDonnell Douglas</u>

<u>Corp.</u>, 411 U.S. at 802. To establish a *prima facie* case of discrimination, a plaintiff must show

"(1) [s]he is a member of a protected class (2) who performed [her] job satisfactorily (3) who

suffered an adverse employment action (4) under circumstances giving rise to an inference of

discrimination." <u>Pronin</u>, 383 F. Supp. 2d at 636 (citing <u>McDonnell Douglas Corp.</u>, 411 U.S. at

802).

If a plaintiff is able to establish a *prima facie* case, it creates a presumption of the

employer's unlawful discrimination. <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S.

248, 254 (1981). A defendant may rebut this presumption by producing evidence, which, if

taken as true by a jury, would allow the conclusion that there was a nondiscriminatory reason for

the dismissal. Weinstock, 224 F.3d at 42; Burdine, 450 U.S. at 254. The defendant's burden is to produce, not persuade. St. Mary's Honor Center, 509 U.S. at 507.

If the employer proffers evidence of a nondiscriminatory motive for termination, the presumption of discrimination evaporates, Weinstock, 224 F.3d at 42, and the burden shifts back to the plaintiff, who, in order to survive a motion for summary judgment, must offer evidence that suggests that the defendant's proffered reason is pretext for intentional discrimination. McDonnell Douglas, 411 U.S. at 803. The plaintiff's evidence must be sufficient to allow a jury to infer that the dismissal was actually motivated by discrimination. Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997). However, the "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995); see also Hagelthorn v. Kennecott Corp., 710 F.2d 76, 82 (2d Cir. 1983). To satisfy this burden, the plaintiff may rely solely on the evidence presented in the *prima facie* case. Hicks, 509 U.S. at 510.

     B.    Application

Plaintiff claims she was subjected to discrimination in the terms and conditions of her employment (1) on account of her race, and (2) in retaliation for having raised "good faith complaints about the [1115] Fund's perceived discriminatory employment practices." (Cmplt. ¶ 33). Plaintiff further alleges retaliatory termination in response to these alleged good faith complaints against the 1115 Fund. (Id. ¶¶ 34, 37). Because there is no direct evidence of racial discrimination, (see, e.g., Pl. 56.1 Stmt. ¶¶ 55, 115), the McDonnell Douglas framework applies to these claims.

1.      'Terms and Conditions'

    a.      Pre-Retaliation Claims

Plaintiff claims that "in the latter part of 1999, Hamilton made some decisions and engaged in some actions that I felt were motivated by my race and by the race of my Clinic Manager, Debbie Carnarvon . . . ." (Beverly Decl. ¶ 11).[3]  Specifically, Plaintiff claims that (1) Hamilton did not discuss Olken's complaints with her prior to calling a meeting, and sided with Olken after the meeting, (Beverly Decl. ¶¶ 13-16), (2) Hamilton shifted "a large number of important supervisory responsibilities from my Clinic Manager, Debbie Carnarvon, to Olken," (Id. ¶ 18), and (3) Hamilton "became more aggressive and confrontation in his communications with me[,]. . . started finding fault in nearly all of my work . . . [and] started relying on email to communicate with me . . . ." (Id. ¶ 23).  Plaintiff also claims that while she was on vacation, "Hamilton had launched a major email criticism of Carnarvon concerning" the directory.  (Id. ¶ 25).  Plaintiff believed these criticisms to be poorly timed and partially unfounded.  (Id. ¶¶ 25-26).

In order to establish the requisite *prima facie* case under the McDonnell Douglas framework, Plaintiff must show "(1) [s]he is a member of a protected class (2) who performed [her] job satisfactorily (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination."  Pronin, 383 F. Supp. 2d at 636 (citing McDonnell Douglas Corp., 411 U.S. at 802).  Plaintiff fails to satisfy either the third or fourth prongs of this requirement.[4]

    i.      Adverse Employment Action

---

[3] According to Plaintiff, the alleged mistreatment that occurred after the January 5, 2000 memorandum was part of Hamilton's "retaliatory vendetta against me, in which he treated me unprofessionally and with contemptuous disrespect . . . ." (Beverly Decl. ¶ 11).  These claims are addressed in the retaliation section, *infra*.
[4] The Court need not and does not address whether Plaintiff performed her job in a satisfactory manner.

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (citing Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). A materially adverse change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities . . . [and] might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Crady, 993 F.2d at 136.

It is undisputed that Plaintiff's salary and benefits were not "reduced or affected at any time during her period of employment." (Def. 56.1 Stmt. ¶ 121; Pl. 56.1 Stmt. ¶ 121). It is also undisputed that, with the possible exception of Hamilton, Plaintiff was the highest paid employee of the 1115 Fund. (Pl. 56.1 Stmt. ¶ 21; Def. 56.1 Stmt. ¶ 21). Finally, it is undisputed that Plaintiff was paid more than Dr. Menzies, her counterpart in the Dental Department. (Pl. 56.1 Stmt. ¶ 21; Def. 56.1 Stmt. ¶ 21). Plaintiff has not shown any decrease in benefits, change in her title or any other indication of diminished responsibilities or compensation. Plaintiff's only claim, then, is that (1) Hamilton sided with Olken in their dispute and was "aggressive and confrontation[al]" towards her, (Beverly Decl. ¶ 23), (2) Hamilton shifted responsibilities between two other employees and (3) Hamilton offered allegedly unwarranted and untimely criticisms of the physician directory. These do not rise to the level of an "adverse employment action" as contemplated by § 1981 and Plaintiff's claims are therefore without merit.[5]

---

[5] Plaintiff claims she was subjected to an adverse employment action because her predecessor had an employment contract and she did not. She further claims that this raises an inference of discrimination because her predecessor was Caucasian. While the Court is dubious of any such claims, even to the extent they do establish a *prima facie* case, Defendants have offered a non-discriminatory reason for her lack of an employment contract: "[Plaintiff] had been advised when she was hired that the [1115] Fund did not provide [employment] agreements, and it was further explained to her that the prior medical director had an agreement (in which the [1115] Fund nonetheless

## ii.    Inference of Discrimination

Plaintiff has also failed to make a *prima facie* showing of an inference of discrimination. "[A]n inference of discrimination may be drawn from a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably." Hunter v. St. Francis Hosp., 281 F. Supp. 2d 534, 542 (E.D.N.Y. 2003) (citing Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994)). Plaintiff has not made a *prima facie* showing of any of these types of discrimination. The "aggressive and confrontation[al]" behavior of which Plaintiff complains was completely devoid of "ethnically degrading terms," Hunter, 281 F. Supp. 2d 534; (Beverly Decl. ¶ 26), and Plaintiff has not made any showing of invidious comments about other African-American employees or preferential treatment of employees of other races.[6]

Furthermore, while Plaintiff makes passing reference to the December 8, 1999 memorandum, this document does not raise an inference of discrimination. Specifically, Plaintiff has not alleged nor offered any facts that David Hellman, the individual who used the term 'dark vader,' was her "employer." Furthermore, Plaintiff has neither alleged nor offered facts showing that Hellman was in any way involved the resolution of Plaintiff's dispute with

---

reserved the right to terminate his services), because, unlike [Plaintiff], he gave up his private practice to become medical director." (Def. 56.1 Stmt. ¶ 72; Pl. 56.1 Stmt. ¶ 72). Plaintiff has failed to offer any evidence that this proffered reason is pretext for intentional discrimination, McDonnell Douglas, 411 U.S. at 803, and her claim regarding the employment contract cannot survive summary judgment.

[6]Furthermore, while the Court expresses no opinion as to the merits of any such claims, Plaintiff's claims regarding the shift of responsibilities from Carnarvon to Olken are, at best, claims that should be brought by Carnarvon and not Plaintiff.

Olken or the decision alter Olken's reporting line and responsibilities. This isolated comment by an unidentified individual is therefore insufficient to raise an inference of discrimination.

b.      Retaliation Claims

Plaintiff claims that, as a result of her January 5, 2000 memo, Hamilton harbored a "retaliatory vendetta against me, in which he treated me unprofessionally and with contemptuous disrespect . . . ." (Beverly Decl. ¶ 11). According to Plaintiff, Hamilton acted unprofessionally towards her, isolated her from the rest of the 1115 Fund and Board of Trustees and interfered with her ability to manage her department. Furthermore, Plaintiff claims that Hamilton told her he would no longer meet with her alone. (Id. ¶¶ 35, 36). As with the discrimination claim, in the absence of direct evidence, the McDonnell Douglas test applies. Plaintiff must *prima facie* demonstrate that she (i) engaged in a protected activity, (ii) suffered an adverse employment action, and (iii) there was a causal connection between the two. Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995).

Plaintiff has failed to identify any adverse employment action, as required by § 1981, and her claims of retaliatory discrimination in the terms and conditions of her employment therefore fail.[7] Plaintiff alleges that Hamilton acted unprofessionally, communicated with her via e-mail and "would interject himself into small, routine issues and micromanage matters that simply did not need his attention and about which he was often ill informed [sic]." (Beverly Decl. ¶ 38). She does not dispute, however, that her compensation and benefits remained the same. As the Second Circuit has explained, "[n]ot every unpleasant matter short of [discharge or demotion] creates a cause of action . . . ." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997). Plaintiff's claims that Hamilton acted unprofessionally and micromanaged her

_____
[7]The Court need not and does not address whether Plaintiff has made a sufficient showing of a causal connection.

department are insufficient to survive summary judgment.  See Dunphy v. Delta Airlines, Inc., 290 F. Supp. 2d 311, 317 (E.D.N.Y. 2003) ("The harassment about which [Plaintiff] complains can be accurately characterized as the mere annoyances caused by one's supervisor ensuring that one's job is being well done.  While it seems unnecessary for [the supervisor] to have been rude or nasty when monitoring [Plaintiff's] performance, [his] behavior towards [Plaintiff] is insufficient to support a jury finding of a materially adverse change in the conditions of [Plaintiff's] employment.")

Furthermore, even if Plaintiff had established a *prima facie* case of retaliatory 'terms and conditions,' Defendants contend that Hamilton was simply supervising and, as necessary, disciplining Plaintiff to ensure that her work was being done properly.  This non-discriminatory reason for his actions removes any presumption of discrimination and requires Plaintiff to offer evidence "sufficient to allow a jury to infer that the [retaliatory conduct] was actually motivated by discrimination."  Grady v. Affiliated Cent., Inc., 130 F.3d at 560.  Since she has not done so, Defendants are entitled to summary judgment.

c.     Hostile Work Environment

Plaintiff also asserts a hostile work environment claim.  A plaintiff asserting a hostile work environment claim must establish "(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  Van Zant v. K.L.M. Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) (citing Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995)); see also Citroner v. Progressive Cas. Ins. Co., 208 F. Supp. 2d 328, 339 (E.D.N.Y.

19

2002) (noting that the standards for a hostile work environment claim are the same under each of Title VII, § 1981, NYHRL and the NYC Code) (citing Whidbee, 223 F.3d at 69).

In determining whether a workplace is permeated with discriminatory intimidation, the Court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993). The Second Circuit has reiterated the Supreme Court's mandate that "'conduct that is merely offensive' will not rise to the level of a hostile work environment." Leibovitz v. New York City Transit Auth., 252 F.3d 179, 189 (2d Cir. 2001) (quoting Harris, 510 U.S. at 23). Furthermore, as the Second Circuit has stated,

> [e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

Alfano v. Costello, 294 F.3d 365, 377-78 (2d Cir. 2002). Plaintiff has not shown evidence of pervasive intimidation, nor of the necessary linkage between any of Hamilton's alleged actions and Plaintiff's race. Furthermore, Plaintiff has failed to make any allegations or offering any facts offering a specific basis for imputing the single 'dark vader' comment allegedly made by Hellman, as reported in the December 8, 1999 memorandum, to the employer. Plaintiff's hostile work environment claims are therefore dismissed.

### 2.     Retaliatory Termination

Plaintiff alleges that she was terminated in November 2001 in retaliation for her January 5, 2000 memorandum to Hamilton and February 2001 draft EEOC charge. A claim of

retaliatory discharge is analyzed pursuant to the McDonnell Douglas burden shifting regime.

Tomka, 66 F.3d at 1308. In order to establish a *prima facie* case, Plaintiff must show that (i) she

engaged in a protected activity, (ii) she suffered an adverse employment action, and (iii) there

was a causal connection between the two. Id. Plaintiff's January 5, 2000 memorandum and her

February 15, 2001 draft EEOC charge were both protected activities, and she therefore satisfies

the first prong. Plaintiff's termination in November 2001 was clearly an adverse employment

action, and she therefore satisfies the second prong. Her claim fails, however, under the third

prong.

Plaintiff's January 5, 2000 memorandum was transmitted approximately 22 months prior

to her termination; her February 2001 draft EEOC charge was sent to Sackman approximately 9

months before she was fired. Plaintiff has not presented any direct evidence of a causal

connection, and her claim will therefore only survive if she can make an indirect showing of

such a connection. While the Second Circuit has not drawn a bright line on the outer limits of

temporal proximity, Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir.

2001), the extended time periods between the protected activities and termination in this case

renders any claims of causal connection meritless. See Clark County Sch. Dist. v. Breeden, 532

U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient evidence of

causality to establish a prima facie case uniformly hold that the temporal proximity must be

'very close.'); Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004) (finding a causal nexus

where termination proceedings commenced two weeks after the protected activity); Tiffany v.

KDF Co., 04-cv-0677, 2005 U.S. Dist. LEXIS 26201 (N.D.N.Y., Oct. 25, 2005) (citing Gorman-

Bakos and noting that the Second Circuit has allowed claims to continue where temporal

proximity ranged from twelve days to eight months). Therefore, Plaintiff has failed to establish a *prima facie* case of retaliatory termination.

Furthermore, even if Plaintiff has established a *prima facie* case of retaliatory termination, Defendants have offered a non-discriminatory explanation for her termination: the merger. In response to this rebuttal, Plaintiff is required to put forth "evidence . . . [that is] sufficient to allow a jury to infer that the dismissal was actually motivated by discrimination. Grady v. Affiliated Cent., Inc., 130 F.3d at 560. Plaintiff has not done so, and her retaliatory termination claim therefore does not survive summary judgment.

V.      Conclusion

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Sandra J. Feuerstein
United States District Judge

Dated: December 5, 2005
Brooklyn, New York

22

To:

Michael G. O'Neill
30 Vesey Street
Suite 301
New York, NY 10007

Elena Paraskevas-Thadani
575 Madison Avenue
New York, NY 10022

Lauren R. Brody
Torys
237 Park Avenue
New York, NY 10017

Bettina B. Plevan
Proskauer Rose LLP
1585 Broadway
New York, NY 10036

Stephanie G. Boyarsky
Office of the General Counsel
1199 National Benefit Fund
330 W. 42nd St - 31st Street
New York, NY 10036